

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

**JOHN DOE**                                                    **PLAINTIFF**

**V.**                                        **CAUSE NO:2:18cv153-KS-MTP**

**THE UNIVERSITY OF SOUTHERN MISSISSIPPI;**
**STATE INSTITUTIONS OF HIGHER LEARNING ("IHL");**
**STATE OF MISSISSIPPI; RODNEY D. BENNETT in his official;**
**REBECCA MALLEY in her official capacity.**
**Capacity; and DOES 1-10**                            **DEFENDANTS**

### FIRST AMENDED COMPLAINT
### JURY TRIAL DEMANDED

Plaintiff John Doe[1] (" Doe"), files this Complaint seeking declaratory, injunctive and

monetary relief against Defendants the University of Southern Mississippi ("the University")

State Institutions of Higher Learning (" IHL"), the State of Mississippi ("State"), and Rodney

Bennett, for gender-based discrimination in violation of Title IX of the Education Amendments

of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"), violations of the due process clause of the

Fourteenth Amendment to the U.S . Constitution brought pursuant to 42 U.S.C. § 1983 and for

breach of contract. In support of this Complaint, Doe alleges as follows:

1. As a result of the false allegation s of sexual misconduct that were made against John
   Doe and the actions taken by the Defendants both individually and collectively, Doe has
   been unable to continue his education at the University and a finding of sexual assault
   has been listed in his educational records. Doe has sustained and continues to sustain
   damages to his education and his career opportunities as a result of the University's denial
   of due process and erroneous finding that he was responsible for an offense he did not

---

[1] Plaintiff files herewith a motion to proceed pseudonymously

commit, and the related issuance of excessive discipline in the form of suspension from the University. However, there is no guarantee that Doe will be re-admitted once the suspension term is completed. In addition, Doe will likely not be able to enroll at any other college, or be accepted, because of the University's finding of sexual misconduct.

2. The authority and jurisdiction of the University's policies and procedures are established pursuant to the delegation of legal authority by the President and the Board of Trustees of State Institutions of Higher Learning. In Article IX, § (5) of the bylaws and policies of the Board of Trustees of State Institutions of Higher Learning, the President of the University of Southern Mississippi is charged with the responsibility of maintaining appropriate standards of conduct for students and is authorized to expel, dismiss, suspend, and/or place limitations on continued attendance and/or levy penalties for disciplinary violations subject to procedures of due process.

3. The policies and procedures enacted by the University, pursuant to the delegation of authority granted by the President and the Board of Trustees of State Institutions of Higher Learning, and as applied in practice and custom, favor females over males in sexual assault disputes and denied John Doe his due process rights in violation of the Fourteenth Amendment to the U.S. Constitution.

4. Throughout the investigative and appeal process, the Defendants failed to abide by the University's guidelines and regulations and acted in direct violation of federal and state law. Furthermore, the University failed to conduct a thorough and impartial investigation of the allegations brought against John Doe, failed to conduct and ensure a timely adjudication process and made credibility and evidentiary assessments with respect to the parties and witnesses that were not based upon substantive evidence.

5.  The University knew or should have discovered during the course of an unbiased investigation, that Jane Roe ("Roe") solicited and instigated sexual activity with John Doe, consensually participated in sexual activity with Doe and only made allegations against Doe in retaliation for reasons which include inter alia not being invited to his fraternity formal.

6.  The University, Defendant Murry and Defendant Ussery failed to obtain and/or consider relevant exculpatory evidence during the course of the investigation and exhibited a gender bias towards John Doe. In addition, the Defendants failed to provide a rationale for the ultimate decision to expel Doe and failed to afford Doe the presumption of innocence required as a matter of law.

7.  The determination issued by the Defendants against John Doe did not take into consideration the substantial weight of the evidence available. The actions of the Defendants exhibited a gender bias against males and an underlying motive to protect the University's reputation and financial status.

8.  The wrongful actions taken by the Defendants resulted in a denial of John Doe's Fourteenth Amendment substantive and due process rights and were in violation of Title IX. In addition, the University's actions were in breach of its contract with Doe.

9.  John Doe has been significantly damaged by the Defendants, individually and collectively. As a result of the unconstitutional and biased actions and omissions of the Defendants, Doe was expelled resulting in damage to his educational and career prospects, psychological, emotional and reputational damages, and economic injury.

10. John Doe brings this action to obtain relief for a violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et. seq., violations of the substantive and

procedural due process clauses of the Fourteenth Amendment to the U.S. Constitution brought pursuant to the procedural vehicle of 42 U.S.C. § 1983, and for breach of the University's contract with him. Doe seeks declaratory, injunctive and monetary relief to remedy emotional, mental, and economic harms he has suffered.

## PARTIES

11. Plaintiff John Doe is a natural person and is a resident of Mississippi. During the events at issue herein he was an undergraduate student at the University of Southern Mississippi and resided in Hattiesburg, Mississippi.

12. Jane Roe is a non-party undergraduate student at the University of Southern Mississippi and the Complainant in the underlying Title IX disciplinary proceeding against John Doe.

13. John Doe seeks to use pseudonyms "John Doe" and "Jane Roe" in this Complaint in order to preserve his privacy and the privacy of the student who raised the allegations against him, as the subject of this Complaint relates to intimate and personal matters. A separate motion in support of this request has been filed with the Court.

14. The public's interest in knowing the identities of John Doe and Jane Roe is outweighed by privacy concerns. In addition, use of pseudonyms will not prejudice the Defendants because they know the identities of both John Doe and Jane Roe. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 36 L.Ed.2d 201 (1973). Furthermore, the disclosure of Doe's identity will cause him irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g); 34 CFR Part 99.

15. Defendant University of Southern Mississippi is a public university created by the Mississippi legislature. The University of Mississippi's main campus is situated in Hattiesburg, Mississippi, and multiple additional campuses are situated throughout Mississippi.

16. Defendant State Institutions of Higher Learning ("IHL") is the constitutional governing body responsible for policy and financial oversight of public institutions of higher learning in Mississippi. IHL is the body responsible for conferring degrees upon students of state institutions. IHL is situated at 3825 Ridgewood Road, Jackson, Mississippi. As an element of contract, The Board of Trustees of the IHL confers the degrees and diplomas upon students graduating from the University. But for the actions complained of, John Doe had a reasonable expectation of receiving such a degree and diploma from the University by and through the IHL. The Defendant State of Mississippi is responsible for the actions of the remaining Defendants as they are its agencies, subdivisions, agents and/or employees; such acts represent the actions of the State itself as a matter of law.

17. Defendant Rodney Bennett is the president of the University of Southern Mississippi. His office with the University is located in the Aubrey K. Lucas Administration Building on the University campus in Hattiesburg, Mississippi. Bennett is sued in his official capacity for those actions taken in conjunction with the regulations set forth by the Institutions of Higher Learning and the University of Southern Mississippi and the State, as well as the policies and procedures of the University of Southern Mississippi. Prospective injunctive and declaratory relief is sought from this Defendant.

18. Defendant Rebecca Malley is the Title IX Coordinator for the University of Southern Mississippi. Her office with the University is located at 118 College Drive, Hattiesburg,

Mississippi, 39406. Malley is sued in her official capacity for those actions which were taken in conjunction with the practices, policies and procedures of the University of Mississippi.

19. Does 1-10 are persons and entities who are responsible for the improper actions against John Doe, including but not limited to the Title IX disciplinary investigation and sanction of expulsion, or who are later identified as necessary parties.

<u>JURISDICTION AND VENUE</u>

20. This case arises in part under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and the Fourteenth Amendment to the United States Constitution, brought pursuant to the procedural vehicle of 42 U.S.C. §1983 and accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Furthermore, the Plaintiff and Defendants have complete diversity and this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

21. This Court has supplemented jurisdiction over Plaintiff's state law contract claim pursuant to 28 U.S.C. § 1367.

22. The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

23. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. Defendant the University has a campus situated in this district. Further, certain of the predicate acts giving rise to the claims herein occurred in part within this district.

## STATEMENT OF THE FACTS

### The Relationship Between John Doe and Jane Roe

24. While attending the University in the winter/spring of 2016 John Doe and Jane Roe exchanged phone numbers and began text messaging each other. The exact date is unknown although the time frame appears to be mid to late February.

25. Roe was a "party promoter" and Doe and Roe saw each other at a party that evening.

26. After the party Roe texted Doe and asked Doe what Doe was doing the night the parties began text, to which Doe responded "Chilling" in his dorm room.

27. Roe asked if she could come over to Doe's room that same evening[2].

28. Roe left her dorm room and went to Doe's dorm room after 1 a.m. Because of the late hour, Doe had to sneak Roe into the dorms.

29. Prior to Roe sneaking into Doe's dorm, the parties had discussed, via text messages, a sexual interaction.

30. While in Doe's dorm room, the parties began kissing and engaged in admittedly consensual foreplay and fondling.

31. The foreplay and fondling culminated in the parties engaging in consensual sexual intercourse, followed by both Roe and Doe sleeping in Doe's dorm room for the night.

32. The next day, Roe awoke and returned to her dorm room.

33. No reports of sexual misconduct were made to any official following the consensual sexual interaction.

---

[2] The parties dispute who initiated the invitation.

34. Two months later, Roe apparently learned that she had an STD. In response Roe reported to the medical staff that "a boy" had forced himself on her, but no name was given for this "boy." Eventually, Roe retracted her claim that Doe was the source of the STD.

35. Upon information and belief these medical records may contain exculpatory evidence.

36. As shown by medical records, Doe does not have an STD, so Doe could not have been the "boy" who gave Roe an STD.

37. Over two years later, Roe was faced with expulsion from the University because of bad grades. In response, Roe reported that her bad grades were a result of her experience with Doe, which she now, after two years, reported to University as a "rape" in order to avoid consequences for Roe's academic issues.

38. Roe did not want to pursue the matter, but because of federal law the University was required to inquire and investigate the matter further.

39. Roe told the Defendants and the panel interviewing her that she did not want to pursue criminal charges. Presumably, Roe wanted to be allowed to attend school and not be excluded from school because of her grades, while avoiding the possibility that law enforcement would uncover her untruths.

**Title IX complaint and the University Investigation**

40. In May of 2018 Dr. Emily Stanback contacted the University Police Department due to Roe's allegation of sexual assault.

41. Lt. Donald Parnham responded and spoke with Roe about her allegations. Initially, Roe refused to give a statement. It was not until days later that Roe gave a statement to Lt. Parnham.

42. Roe has had other issues and Roe was in the University Police Department system.

43. According to Lt. Parnham, Roe initially claimed to have gone to the health center the day after the incident and tested positive for an STD. (medical records indicate it was at least two months before Roe went to the health center)

44. Roe informed Lt. Parnham that Roe did not want to file criminal charges, but Lt. Parnham informed Roe that he was required to report the matter to the Title IX office.

45. Ultimately, Lt. Parnham questioned Roe's credibility and motive under the circumstances. Lt. Parnham noted that Roe was not upset when she discussed the issues and that Roe did not provide him with "good answers" to his questions.

46. Law enforcement did not pursue the matter any further.

47. In accordance with University policy, a panel known as the Sexual Misconduct Investigative Team ("SMIT") was empaneled to investigate Roe's allegations.

48. Doe was made aware of the allegations and met with Defendant Malley on or around July 5, 2018. Doe was provided Roe's statement and a copy of the rules he was alleged to have violated. Roe was informed he could provide witnesses, but Roe was not told that he could have a "support person," such as an attorney, present throughout interviews. The University/Malley's failure to inform Doe regarding a "Support person" violated Rule 10.0 of the Sexual Misconduct Policy.

49. The SMIT was comprised of an economics professor, a staff member of New Student and Retention Programs, and an associate director of Housing and Residence Life. Upon information and belief, none of these persons have the appropriate training or experience in investigating and handling allegations of sexual assault.

50. Upon belief, these persons have less than a full day of training to handle investigations of this nature, while even seasoned law enforcement officials struggle to identify fact from fiction in sexual misconduct type cases.

51. In July of 2018 the SMIT organized interviews of the parties and potential witnesses.

52. Only SMIT was present during the interviews of "witnesses," some of which were conducted by phone.

53. There are no non-party witnesses to the even in question, only after the fact, circumstantial witnesses.

54. Doe was interviewed on or about July 18, 2018. Prior to the interview Doe had been tested for an STD, at the recommendation of Defendant Malley because Roe had claimed that Doe had given her an STD. When Roe tried to give the SMIT a copy of the test results showing Doe did not have an STD, the SMIT told Doe that the test was not needed because Roe had retracted the claim that Doe had given her an STD.

55. No party was allowed to ask questions, cross examine witnesses, or present their own evidence to the SMIT.

56. When Roe was questioned by SMIT, she admitted that the parties had texted the day of the event and Roe had to sneak into the dorm after 1 a.m. Roe also admitted that the parties engaged in consensual fondling, foreplay, and kissing.

57. According to the SMIT report, Roe admitted that Doe had "pulled out his penis" before the parties started cuddling and engaged in consensual fondling in the bed. While engaging in foreplay, Doe had completely removed his pants, according to Roe.

58. Apparently, Roe was interviewed more than once by SMIT. According to the SMIT report, during the first interview, Roe claimed that Doe only pulled her shorts down and

penetrated Doe from behind. During the second interview, according to the report, Doe somehow managed to hold Roe down and completely remove Roe's shorts prior to penetration. These inconsistencies are never explained.

59. According to the reports, Roe reported in one interview that she was not naked during the event in question, but Roe also reported that when she woke up the next morning Roe had to collect her clothes. These material inconsistencies cannot be explained.

60. In addition, according to the report, during one interview, Roe claimed to leave the room as soon as Doe fell asleep. However, in the second interview, Roe claimed to have fallen asleep and simply woke up early in the morning to leave. These inconsistencies are never explained.

61. Upon information and belief, the report inaccurately paraphrased and summarized certain witness statements, while disregarding others. As an example, the report claims that Doe was not credible, and that Roe's version of events was more credible. The report fails to note:

   a.  Roe claimed not to remember texting Doe about a planned sexual interaction, while witnesses reported having seen these messages which Roe could not recall;

   b.  Roe contracted an STD from a "boy she was getting to know" and Doe does not have any STDs;

   c.  Roe could not produce any text messages or phone records in support of her allegations;

   d.  Roe did not report the alleged incident until she was threatened with suspension from the University due to academic issues;

e.  University police, trained to investigate allegations, did not find Roe to be
    credible;

f.  Roe later retracted her claim that Doe had given her an STD;

g.  Roe changed her story about how the parties met at least three times – Instagram,
    in front of Moffitt, in front of Cochran Center.

h.  Material and substantive inconsistencies regarding the event, including the
    removal of clothes and timing and duration of the event;

i.  The SMIT also ignored both parties' witness ████████████ who said that Roe
    was simply upset that the two and just started talking and that the two had sex
    their first night together; and

j.  Doe's initial refusal to make a report.

62. The investigation also failed to investigate social media belonging to Roe which is replete
with impeachment evidence. Based upon a novice review of social media, Roe was not
depressed, went out on many occasions, and regularly attended social functions –
contrary to the SMIT report. This glaring error contradicts a majority of Roe's claims.

63. The investigation also failed to look into and request from the University Police
Department information regarding other incidents involving Roe, which had been
reported by Lt. Parnham to the SMIT. These other incidents would have further effected
Roe's credibility.

64. The SMIT report also found fault with Doe and his witnesses claims that they had no
knowledge about Roe's claims before the investigation began. According to the SMIT
report, Doe knew about Roe's allegations because Doe had allegedly been told by a
witness and refuted the witness's allegation with text messages. However, the SMIT

apparently misunderstood the witness, or should have interviewed Doe again, after the

witness, to see if Doe could explain the discrepancy.

65. Upon belief, the witness actually showed Doe text messages where Roe was discussing

having sexual intercourse with Doe. These messages did **not** include any reference to

sexual assault or rape. This discrepancy highlights the need for due process and Doe's

ability to question witnesses, or at least be present when witnesses were questioned so

that Doe could explain or correct misunderstandings.

66. In addition, according to the SMIT report, the witness discussed in ¶ 64-65 did not learn

about Roe being allegedly raped by Doe until the spring of 2018. Therefore, if the

witness did not know about the allegation until the spring of 2018, it is impossible for the

witness to have questioned Doe in October of 2016 about the allegation.

67. The investigation also faulted the credibility of one of Doe's witnesses[3], claiming that the

witness was on campus but refused to be interviewed in person. The investigation also

concluded that the witness was being "coached." In reality, had the investigation been

done in a proper and unbiased manner, the investigation would have revealed that the

witness was at a University event that week, representing the University, in another state

when the interview was initially setup and the witness was asked if the witness would

prefer to meet in person or on the phone. Out of convenience, the witness responded that

they would prefer to be interviewed on the phone since that was an option provided.

Given the situation, the witness could have easily been "forced" to attend in person.

68. The investigation also asserted that because the witness[4] did not "report" certain facts,

somehow the interview discredited Doe. Somehow, the investigation panel seemed to

---

[3] LH.
[4] LH.

believe that a witness being interviewed should report facts without being questioned about facts.

69. The SMIT report also "bolstered" Roe's credibility because Roe told a SINGLE person, her roommate, that Doe had allegedly raped her. The SMIT failed to obtain details about the event. The roommate even said that Roe did not give her many details. The roommate then told a couple of other persons about the allegation, but no person took the allegation seriously. Hearsay to does not support credibility.

70. Witnesses also told the interview panel that Roe was upset with herself for sleeping with Doe on the first night that the two hung out together. According to the apparently disregarded witness statements, according to witnesses whose statements do not appear in the report, Roe was upset because "They had just started talking, and she was upset that she went over there the first night that they had met, and something happened." There is no explanation in the report as to why this witness's exculpatory statement was left out of the report. This statement would have been vital to the University's ultimate decision to sanction Doe.

71. All witnesses contradict Roe's claims that she was depressed because of the alleged rape. All witnesses who know/knew Roe testified that any alleged changes in Roe's behavior began over the summer/fall of 2017, when Roe failed to be admitted to a campus group, which would have been over a year later, if at all.

## The July 27, 2018 and August 10, 2018 SMIT Letters

72. As an initial note, the SMIT plays the role of investigator and jury – leaving the execution up to the University.

73. The fact that the SMIT's role is to investigate and make a final determination of fault deprives Doe of due process under the law, because the SMIT is not a "neutral party" since the SMIT has a stake in the outcome as the investigator. The role of the SMIT would be no different than allowing a police officer to investigate a case and then make a determination of guilt, only allowing a judge to sentence the Defendant.

74. The University is the only similarly situated University in the State of Mississippi which utilizes the investigative process without an independent, neutral party to decide guilt or innocence and/or without allowing the accused to hear the interviews of witnesses.

75. On July 27, 2018 Doe received a letter with a summary of the information obtained by the SMIT. The letter asked if Doe had any changes/corrections/additions to the summary. The letter did not ask Doe for any sort of rebuttal or response to any statements.

76. On August 10, 2018 the University sent Doe a letter finding Doe at fault for sexual misconduct. This letter removes information contained in the July 27, 2018 letter as well as adds information not contained in the July 27, 2018 letter.

77. One vital and important piece of information which was used to attack Doe's credibility was the allegation that a witness allegedly told Doe in 2016 that Roe had accused Doe of rape. This allegation appears to be the primary basis for finding that Doe was not credible. This allegation WAS NOT contained in the July 27, 2018 letter. This allegation appeared for the first time in the August 10, 2018 letter from the University, depriving Doe of an opportunity to respond to what is obviously a vital mistake by the SMIT.

78. Further, a reasonable reading of the July 27, 2018 shows a plethora of witness statements which would have supported Doe and discredited Roe's allegations, as previously discussed. This also includes the fact that a witness stated that both Doe and Roe texted

after the incident, but Roe claimed, according to the August 10, 2018 letter, that Doe did not contact Roe after the incident.

79. The July 27, 2018 letter also claims that a person told witness[5] about the incident. However, the letter is unclear as to whether or not Roe was the person who told the witness. The letter simply uses the last name, wherein another witness has the same last name as Roe. According to Roe, she only told a single person about the alleged incident after it happened. Roe claimed to tell other persons later, but Roe never mentioned telling witness[6] about the alleged incident.

80. The University and SMIT discredited all male witnesses based upon information not contained in the July 27, 2018 letter and/or based upon a clearly erroneous finding, a reckless disregard for truth, apparent and implicit bias, and, apparently, materially flawed notes.

**Title IX and The Department of Education**

81. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance must comply with Title IX.

82. Upon information and belief, the implemented standards, criteria, and policies employed and guiding the University were exercised under the auspices of, and pursuant to the U.S. Department of Education's Office for Civil Rights April 4, 2011 "Dear Colleague Letter" student-on-student sexual harassment and sexual violence (also hereafter referred to as "Dear Colleague Letter"). (This Dear Colleague Letter IS Available at http: /www.v2.ed.gov/print /about/offices/list/ ocr/letters/colleague-20 1104.html).

---

[5] K.B.
[6] K.B.

83. The 2011 Dear Colleague Letter and the 2014 guidance required schools to adopt a minimal standard of proof when administering student discipline. The 2011 Letter discouraged cross-examination by the parties and suggested that to recognize a right to such cross examination might violate Title IX. Furthermore, the 2011 Letter limited any due process protections given to accused students as it directed that no unnecessary delay should exist when resolving charges.

84. On September 7, 2017, Betsy DeVos, the U.S. Secretary of Education, announced that "Rule by [the 2011] Letter is over." In a public address she expressed concerns raised by members of academia that the approach pushed by the U.S. Department of Education for the previous several years exerted improper pressure on universities to adopt Title IX procedures that do not afford fundamental fairness to all students. Secretary DeVos advised that she thought the professors who raised these concerns were right and described the system as failed and one that imposed policy without even the most basic safeguards.

85. In a September 22, 2017, Dear Colleague Letter, the U.S. Department of Education, Office of Civil Rights released a notice stating that while the 2011 and 2014 guidance documents may have been well intentioned, they have led to the deprivation of rights for many students and they have denied fair process to accused students. The Office of Civil Rights advised that the April 2011 Dear Colleague Letter's "improper pressure upon universities" resulted in universities developing procedures for resolving sexual misconduct complaints that lacked the "most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX

law or regulation." See https://\www 2.ed.gov/about/offices/ list/ocr/letters/colleague-title-ix-201709.pdf

86. In September 2017 the Office of Civil Rights provided specific guidance for universities with respect to grievance procedures and investigations. It is this guidance that should have served as the standard for the investigation of matters involving John Doe and the determination by the University.

87. The Defendants were aware of the announcement by the Secretary of Education Betsy DeVos and the Department of Education's new guidance. Despite this, the Defendants failed to exercise their authority to modify their unconstitutional policies or practices and/or rectify the erroneous determination and disproportionate sanctions issued to John Doe.

88. The University made no substantive changes to its Title IX procedures.

**Actions of IHL, the University of Southern Mississippi, State of Mississippi, and individual Defendants**

89. John Doe was subjected to an inequitable grievance and appeal process. The determination and decision by the University was not supported by substantial evidence, was arbitrary and capricious, unconstitutional, an abuse of discretion or otherwise not in accordance with law, beyond the power and legal authority of the University under a proper application of law and fact and was discriminatory.

90. The University's policy statement regarding investigations states "The University is committed to fair and prompt procedures to investigate reports of sexual misconduct. Special emphasis is placed on the rights, needs, and privacy of the person filing a

complaint, as well as the due process rights of the accused." However, Doe was not provided due process, procedural or substantive.

91. Due process imposes a duty on the State to disclose exculpatory material and favorable evidence to a defendant. U.S. Const. Amends. 14; *Manning v. State*, 884 So. 2d 717 (Miss. 2004); *Armstrong v. State*, 214 So. 2d 589 (Miss. 1968)

92. Generally, due process requires notice and a meaningful opportunity to be heard. *Vincent v. Griffin*, 872 So.2d 676, 678 (2004) (citations omitted).

93. In the case at hand, there has been no hearing, so it is clear that Doe's rights were violated in that regard.

94. John Doe was not allowed the opportunity to be heard in a meaningful time and in a meaningful manner and likewise was deprived of fundamental substantive rights. Doe has never seen the documents which were submitted against him by the University.

95. According to the University's Sexual Misconduct Policy 10.1, Doe was entitled to a formal investigative hearing. Doe was only interviewed.

96. During the University's hearing process, John Doe was not allowed to cross- examine Jane Roe or any other witness. Doe was not even allowed to submit questions to be asked of Roe or any other witness.

97. The University's policies do not apply any rules of evidence and allow hearsay evidence and other inherently unreliable evidence of sexual misconduct, with the only stated criteria for questions being "relevance."

98. In accordance with Sexual Misconduct Policy 13.6, the standard of proof is simply a preponderance of the evidence, despite the allegations and procedure being "quasi-

criminal." Such a standard of proof violated guidance from the Department of Education as well as legal precedent.

99. The stereotyping and bias of the Defendant created a hostile environment and adverse setting for males accused of sexual misconduct. The pattern and practice of the University of subjecting male students such as John Doe to biased investigations and stereotyping results in unlawful discipline and denial of constitutional rights. All male witnesses were disregarded.

100.    The University improperly uses the preponderance of the evidence' standard to determine whether an individual is responsible for violating the University's Sexual Misconduct policy, a criminal act in this case. In addition, the training provided by the University sets forth an incorrect statement of the preponderance of the evidence standard. In accordance with 5th Circuit jurisprudence, these quasi-criminal proceedings require a heightened standard.

101.    The University subjected John Doe to a proceeding devoid of virtually all due process and any constitutional safeguards and based solely upon a credibility determination. The determination was both excessive and unwarranted and represents a selective enforcement of the University's sanctions policy, as the by-product of gender bias against male students under allegations of sexual misconduct. The University did not provide Doe with even the limited protections and procedural rights set forth on the face of its own policies.

102.    The investigation of Doe and the multiple interviews have been riddled with bias, a failure by the University to abide by Department of Education guidelines and a

conscious and deliberate disregard for Doe's Constitutional rights by each of the Defendants.

## COUNT I
## VIOLATION OF TITLE IX

103.     John Doe hereby incorporates and adopts each and every allegation in the preceding paragraphs as if set forth fully herein.

104.     Title IX of the Education Amendments of 1972 codified at 20 U.S.C. § 1681, et seq. provides, in relevant part:

No person in the United States shall on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

105.     Title IX of the Education Amendments of 1972 codified at 20 U.S.C. § 1681, et seq. applies to all public and private educational institutions, if any part of the school receives federal funds. The University receives such funds.

106.     "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2nd Cir. 1994).

107.     A state is not immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et. seq. or the provisions of any other federal statute which prohibits discrimination by recipients of federal financial assistance.

108.     42 U.S.C. § 2000 d-7 contains an express statutory abrogation of Eleventh Amendment immunity for Title IX suits. This aggregation is a valid exercise of congress' power under the spending clause to impose unambiguous conditions on states receiving federal funds.

109.     By enacting § 2000 d-7, Congress puts states on notice that accepting federal funds waived their Eleventh Amendment immunity to discrimination suits under Title IX. Furthermore, § 2000 d-7 is a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. It is the position of the Department of Justice that § 2000 d-7 is an unambiguous abrogation which gives states express notice that a condition of receiving federal funds is the requirement that they consent to suit in federal court for alleged violations of Title IX and other statutes.

110.     In *Cannon v. The University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed. 560 (1979), the United States Supreme Court held that private individuals have an implied right of action under Title IX and that damages are available in such lawsuits. In addition, the U.S. Supreme Court has ruled that monetary damages are available in private Title IX actions involving intentional violations. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Remedies for a violation of Title IX by a university include compensatory damages, injunctive relief and attorney's fees. *Id.*

111.     The United States Supreme Court has ruled that, "the award of individual relief to a private litigant who has prosecuted [his] own suit is not only sensible, but it is also fully consistent with and in some cases even necessary to the orderly enforcement of the [Title IX]. See *Cannon*, at 706-707.

112.     The University receives federal financial assistance and is subject to Title IX. The University's imposition of discipline where gender is a motivating factor in the investigation and/or decision to discipline is thus enforceable through a private right of action.

113.    The IHL and the University and the State had an obligation under Title IX to make sure that adequate training as to what constitutes sexual harassment and alleged sexual assaults was provided by the University. The training provided herein is wholly devoid of meeting the state's constitutional requirements.

114.    The Department of Education has recognized that the procedures adopted by a university covered by Title IX must afford due process to all parties involved. The United States Supreme Court has found that the reason why due process matters is so that cases are not decided "on the basis of erroneous or distorted conceptions of the law or the facts". *See Marshall v. Jerrico, Inc.*, 446 U.S. 238,242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).

115.    Pursuant to Title IX of the Education Amendments of 1972, John Doe has a right to pursue his education free from discrimination by the University and the other Defendants on the basis of his sex.

116.    In violation of Title IX of the Education Amendments of 1972, John Doe was wrongfully subjected to a University disciplinary proceeding marked by procedural flaws, sex based biased, and selective enforcement.

117.    John Doe was subjected to an erroneous outcome by the Defendants with respect to the investigation and discipline issued against him in this matter, in violation of Title IX. Doe was wrongly found to have committed sexual assault and gender and potentially ideological bias was a motivating factor.

118.    The denial of due process and gender bias that existed throughout the investigation and enforcement of discipline against John Doe resulted in an erroneous

outcome that was based on flawed and distorted facts and/or application by the Defendants.

119.    The Defendants failed to conduct an adequate, reliable and impartial investigation. The investigation was biased against Doe, based upon his gender, and deprived him of material information necessary to meaningfully participate in the investigation and adjudication process.

120.    Defendants limited John Doe's ability to have a fair and impartial hearing. Defendants deliberately and recklessly and intentionally refused to accept evidence from Doe and misrepresented the statements of witnesses in the report.

121.    The Defendants did not weigh the evidence in John Doe's favor and excluded exculpatory evidence from their consideration.

122.    The University proceedings evince gender bias against the John Doe, as a male student, as part of a pattern of decision-making whereby the disciplinary procedures governing sexual assault claims are discriminatorily applied in favor of guilt on the part of the male students.

123.    Upon information and belief, male students in sexual misconduct cases at the University are discriminated against solely on the basis of their sex. Male students are typically found guilty regardless of the evidence and certain exculpatory evidence is excluded from consideration.

124.    The totality of the circumstances establishes that the Defendants acted out of a gender bias in reaching the erroneous outcome in this matter and have demonstrated a pattern of inherent and systemic gender bias and discrimination against male students

who are accused of sexual misconduct at the University. Individuals who support the male students are targeted or ignored.

125.    The University's failure to consider exculpatory evidence or to detail the rationale for the results of the investigation establish the inequity of the proceedings, violate the Cleary Act and are contrary to the most recent guidance of the Department of Education.

126.    An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of the parties and witnesses, and synthesize all available evidence- including inculpatory and exculpatory evidence- and to consider the unique and complex circumstances of each case. See September, 2017 Q&A, citing 2001 Guidance at (V)(A)(l) -(2); See also 34 C.F.R.§668.46 (k)(2)(ii). Absent review of exculpatory evidence, an investigation is inequitable.

127.    The University knew, or in the exercise of due care should have known, that at least one member of the SMIT lacked training to carry out the responsibilities set forth in the disciplinary enforcement requirements of Title IX.

128.    As set forth in the Department of Education's September 2017 Q & A on campus sexual misconduct, issued by the Office of Civil Rights, the Clearly Act requires that post- secondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding. The notification must include any initial, interim or final decision by the institution, any sanctions imposed by the institution and the rationale for the results and the sanctions. See 34 CFR § 668.46 (k)(3)(iv). In addition, the September, 2017 Q & A on Campus Sexual Misconduct provides states that

any rights or opportunities that a school makes available to one party during the investigation should also be made available through the other party on equal terms.

129.     Citing 2001 Guidance at (X). A school may not restrict the ability of one party to discuss the investigation and restricting the ability of either party to do so through gag orders or similar directives is, in the eyes of the Office of Civil Rights, likely to deprive the parties of the ability to obtain and present evidence or otherwise defend their interest and is likely to be considered inequitable.

130.     Contrary to the requirements of the Cleary Act and the Department of Education's guidance, the University's determination letter failed to include any discussion of the inculpatory or exculpatory evidence considered or any rationale for the sanction imposed.

131.     The University's policies and procedures, as implemented and carried out in practice and custom, fail to meet the standards required by Title IX regarding how universities conduct disciplinary proceedings and sanctions.

132.     In violation of Title IX of the Education Amendments of 1972, John Doe has been wrongfully subjected to sanctions by the University and State as a result of the biased and flawed disciplinary proceedings.

133.     Upon information and belief, the Defendants had knowledge that the policies of the University were in violation of Title IX, biased against male students accused of sexual assault and void of due process protections, yet deliberately failed to remedy the situation.

134.     IHL and the University knew or should have known that the actions and omissions of the SMIT posed an unreasonable risk of the denial of due process and

gender discrimination with regard to John Doe and other male students accused of sexual assault.

135.    The investigation and discipline of John Doe was discriminatory and based upon Doe's gender.

136.    As a direct and proximate result of these facts and omissions of the Defendants, John Doe has suffered and continues to suffer harm. Doe is entitled to declaratory relief, an injunction enjoining violation of Title IX by the Defendants in the process of investigating and adjudicated sexual misconduct complaint, and full and immediate reinstatement at the University.

137.    Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution. Additionally, Doe is entitled to damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.

138.    All damages available to John Doe pursuant to Title IX are also available as a consequence of the University's breach of contract with the University, and/or IHL and/or State.

## COUNT TWO

**VIOLATION OF THE 14ᵀᴹ AMENDMENT OF THE UNITED STATES CONSTITUTION, BROUGHT PURSUANT TO 42 U.S.C. § 1983**

139.     John Doe hereby incorporates and adopts each and every allegation in the preceding paragraphs as if set forth fully herein.

140.     The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. Amend. XIV, § 1.4

141.     Pursuant to the Fourteenth Amendment of the United States Constitution, John Doe, possesses a property interest in his status as a student at the University and his education, as well as a liberty interest in his reputation.

142.     The Defendants are state actors who owe John Doe protections consistent with the Fourteenth Amendment to the U.S. Constitution.

143.     Although due process is required in campus disciplinary cases, John Doe's due process rights were denied by the Defendants. At all times herein, the Defendants were acting under color of state law, and their actions and omissions caused John Doe to be subjected to a deprivation of his constitutional rights and suffer harm in violation of Title IX.

144.     The policies, practices and procedures of the University with respect to investigations and issuance of discipline towards the accused, both facially and as applied, violate federal law and are inconsistent with the Department of Education guidelines.

145.     The policies, practices and customs of the University which were adopted, implemented, maintained and sanctioned by the University and its policymaking official(s) were the moving force behind the deprivation of John Doe's constitutional

rights and were adopted, maintained and applied with deliberate indifference to the rights of John Doe and other similarly situated male students.

146. The Defendants' conduct violated John Doe's substantive and procedural due process rights by denying Doe fundamentally fair disciplinary procedures, the right to a meaningful opportunity to clear his name and by irreparably damaging his right to pursue his education and future career opportunities.

147. After learning of the developments from the U.S. Department of Education, including redaction of former guidance and a statement by the Secretary of Education that previously endorsed procedures likely caused violations of students' constitutional rights, the Defendants deliberately took no steps to modify the policies, procedures or training within the Title IX office.

148. The SMIT deliberately and intentionally refused to accept certain evidence presented by John Doe for consideration and refused to consider such evidence in a supplemental submission.

149. Defendants knew or should have known of the requirements of Title IX and the substantive and procedural due process rights to which Plaintiff and others are entitled. Despite this knowledge and the clearly established nature of both statutory and constitutional mandates, they acted with deliberate indifference towards those rights.

150. In addition, the persons assigned to the SMIT have an apparent ideological bias in favor of the accuser (Roe) and against the accused (Doe) in situations involving alleged sexual misconduct. Based upon these apparent ideological biases, the SMIT placed unfair and unconstitutional credibility on Roe's version of events before either party was

interviewed. Said biases further deprived Doe of due process because the investigation was unfair and tainted from the beginning.

151.    Further, the July 27, 2018 letter, as detailed above, is so intrinsically and unexplainably flawed that Doe was never apprised of what issues Doe might need to respond to, depriving Doe of due process under the law.

152.    Further, the SMIT role as investigator and jury deprives Doe of a fair and impartial hearing under the 14th Amendment.

153.    The fact that Doe was not allowed to hear what other witnesses said and did not say also deprives Doe of due process because witnesses may have provided exculpatory evidence or attacked Roe's credibility. Doe could only rely on notes prepared by the persons who convicted him of sexual misconduct.

154.    As a direct and proximate result of the actions and omissions of the Defendants, John Doe has suffered and continues to suffer damages, including but not limited to, loss of educational opportunity, classroom time, loss of future income, liberty and property deprivations, humiliation, and mental anguish. Doe seeks recovery from the Defendants jointly and severally for the damages suffered. Doe is entitled to declaratory relief, an injunction enjoining violation of Title IX by the Defendants in the process of investigating and adjudicated sexual misconduct complaint, and to immediate full reinstatement in good standing at the University. Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution.

155.    Additionally, Doe is entitled to compensatory and punitive damages in an amount to be determined at trial, plus pre-judgment interest, attorney's fees, expenses, costs and disbursements.

## COUNT THREE
## BREACH OF CONTRACT

156.    Plaintiff hereby incorporates and adopts each and every allegation in the preceding paragraphs as if set forth fully herein.

157.    John Doe paid the University's fees and tuition for his education, and in return the University, IHL and State contracted to provide him with access to its undergraduate programs and ultimately, upon further performance by Doe, to continued education and a degree and diploma. This relationship is contractual in nature.

158.    The University and/or IHL and/or State breached its contractual obligations to John Doe by failing to abide by Title IX, subjecting Doe to a gender bias and failing to comply with its own policy and procedures, and by the adoption and implementation of unconstitutional customs, policies and practices in the implementation of Title IX at the University.

159.    John Doe is entitled to recover damages for the University's breach of contract. As a direct and proximate result of the University's conduct, Doe sustained damages including the inability to attend classes, and continue pursuit of his education, harassment, threats, emotional distress and economic damages including attorney's fees, for which recovery is sought pursuant to 42 U.S.C. Section 1988 and otherwise.

160.    Alternatively, if the Court determines that an express contract between John Doe and the University does not exist, after expiration of a 120-day waiting period following

the service of the University with a tort claims notice, Doe will assert a breach of implied

contract claim

## COUNT FOUR

**VIOLATION OF THE 14ᵀᴴ AMENDMENT OF THE UNITED STATES
CONSTITUTION, BROUGHT PURSUANT TO 42 U.S.C. § 1983 – SUBSTANTIVE
DUE PROCESS BY ARBITRARY AND CAPRICIOUS ACTION**

161.     Plaintiff hereby incorporates and adopts each and every allegation in the

preceding paragraphs as if set forth fully herein.

162.     The actions of the Defendants in rendering a decision to suspend Doe are arbitrary

and capricious and not based upon reason, but rather, based upon will alone.

163.     A reading of the SMIT report shows that the University and the Defendants found

Doe to not be a credible person. The logic and reason behind the finding is arbitrary and

capricious, and only further exemplifies the need for dues process in this matter.

164.     "An act is arbitrary when it is not done according to reason or judgment, but

depending on the will alone." *Burks v. Amite County Sch. Dist.*, 708 So.2d 1366, 1370(¶

14) (Miss.1998) (*citing McGowan v. Mississippi State Oil & Gas Bd.*, 604 So.2d 312, 322

(Miss.1992)). An act is capricious when "done without reason, in a whimsical manner,

implying either a lack of understanding of or a disregard for the surrounding facts and

settled controlling principles." *Id.*

165.     Apparently, Roe was interviewed more than once by SMIT. According to the

SMIT report, during the first interview, Roe claimed that Doe only pulled her shorts

down and penetrated Doe from behind. During the second interview, according to the

report, Doe somehow managed to hold Roe down and completely remove Roe's shorts

prior to penetration.

166.    According to the reports, Roe reported in one interview that she was not naked during the event in question, but Roe also reported that when she woke up the next morning Roe had to collect her clothes. These material inconsistencies cannot be explained.

167.    In addition, according to the report, during one interview, Roe claimed to leave the room as soon as Doe fell asleep. However, in the second interview, Roe claimed to have fallen asleep and simply woke up early in the morning to leave.

168.    Upon information and belief, the report inaccurately paraphrased and summarized certain witness statements, while disregarding others. The report fails to explain why portions of witness statements were not applied to the decision to suspend Doe. As an example, the report claims that Doe was not credible, and that Roe's version of events was more credible. This determination is arbitrary and against the weight of the evidence. The report fails to note:

a.   Roe claimed not to remember texting Doe about a planned sexual interaction, while witnesses reported having seen these messages which Roe could not recall;

b.   Roe contacted an STD from a "boy she was getting to know" and Doe does not have any STDs;

c.   Roe could not produce any text messages or phone records in support of her allegations;

d.   Roe did not report the alleged incident until she was threatened with suspension from the University due to academic issues;

e.   University police, trained to investigate allegations, did not find Roe to be credible;

    f.    Roe retracted her claim that Doe had given her an STD;

    g.    Roe changed her story about the parties met at least three times – Instagram, in front of Moffitt, in front of Cochran Center.

    h.    Material and substantive inconsistences regarding the event, including the removal of clothes and timing and duration of the event;

    i.    The SMIT also ignored both parties' witness Korey Robertson who said that Roe was simply upset that the two and just started talking and that the two had sex their first night together; and

    j.    Doe's initial refusal to make a report.

169.     The investigation also failed to investigate social media belonging to Roe which is replete with impeachment evidence. Based upon a novice review of social media, Roe was not depressed, went out on many occasions, and regularly attended social functions – contrary to the SMIT report.

170.     The investigation also failed to look into and request from the University Police Department information regarding other incidents involving Roe, which had been reported by Lt. Parnham to the SMIT.

171.     The SMIT report also found fault with Doe and his witnesses claims that they had no knowledge about Roe's claims before the investigation began. According to the SMIT report, Doe knew about Roe's allegations because Doe had allegedly been told by a witness and refuted the witness's allegation with text messages. However, the SMIT apparently misunderstood the witness, or should have interviewed Doe again, after the witness, to see if Doe could explain the discrepancy.

172.    Upon belief, the witness actually showed Doe text messages where Roe was discussing having sexual intercourse with Doe. These messages did **not** include any reference to sexual assault or rape. This discrepancy highlights the need for due process and Doe's ability to question witnesses, or at least be present when witnesses were questioned so that Doe could explain or correct misunderstandings.

173.    In addition, according to the SMIT report, the witness discussed in ¶ 61-62 did not learn about Roe being allegedly raped by Doe until the spring of 2018. Therefore, if the witness did not know about the allegation until the spring of 2018, it is impossible for the witness to have questioned Doe in October of 2016 about the allegation.

174.    The SMIT report also "bolstered" Roe's credibility because Roe told a SINGLE person, her roommate, that Doe had allegedly raped her. The roommate then told a couple of other persons about the allegation, but no person took the allegation seriously.

175.    Witnesses also told the interview panel that Roe was upset with herself for sleeping with Doe on the first night that the two hung out together. According to the apparently disregarded witness statements, according to witnesses whose statements do not appear in the report, Roe was upset because "They had just started talking, and she was upset that she went over there the first night that they had met, and something happened." There is no explanation in the report as to why this witness's exculpatory statement was left out of the report.

176.    All witnesses contradict Roe's claims that she was depressed because of the alleged rape. All witnesses who know/knew Roe testified that any alleged changes in Roe's behavior began over the summer/fall of 2017, which would have been over a year later, if at all.

177.     Despite all this, the University arbitrarily and capriciously decided that Doe was not credible, that all male witnesses were not credible, and decided that Roe was credible because she told a single person that she claimed to have been sexually assaulted by Doe.

178.     '(T)he 'protection of the individual against arbitrary action' . . . (is) the very essence of due process,' *Slochower v. Board of Higher Education*, 350 U.S. 551, 559 (1956), but where the State is allowed to act secretly behind closed doors and without any notice to those who are affected by its actions, there is no check against the possibility of such 'arbitrary action. *Id*. Moreover, where 'important interests' of the citizen are implicated (*Bell v. Burson*, 402 U.S. 535, 539 (1971)) they are not to be denied or taken away without due process. *Id*.

179.     The unjust actions by the Defendants have destroyed Doe mentally, physically, emotionally, and professionally. The Defendants'' "closed door" actions must not go without rebuke.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff John Doe respectfully demands trial by jury and requests the following relief:

A.  The Court enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the Defendants have violated Title IX and policies and practices of the University, both facially and as applied violate the due process rights of John Doe.

B.  The Court enter an injunction enjoining Defendants from violating John Doe's constitutional rights and rights established under Title IX, by continuing the discriminatory and unlawful disciplinary action that was issued against him, requiring IHL, the State

Institutions of Higher Learning, the members of the Board of Trustees of State Institutions of Higher Learning each, in their official capacities, the Commissioner of Higher Education, the University, and Chancellor Vitter, to immediately to restore Doe as a student in good standing at the University and prohibiting the Defendants from issuing further disciplinary proceedings against him pending resolution of this matter.  Doe is entitled to have any finding of responsibility wholly and permanently expunged from his academic record and to a seal of all such proceeding to protect against subsequent disclosure to any other person or academic institution.

C.  Retain jurisdiction of this matter for the purpose of enforcing the Court's Order.

D.  Award John Doe monetary relief in an amount to be determined but in excess of the minimum jurisdictional limits of this Court.

E.  Award John Doe costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by Title IX and 42 U.S.C

§1988.

F.  Grant such further and additional relief as the Court may deem just, proper, and equitable.

THIS the 31st day of August, 2018.

Respectfully submitted,

DANIEL M. WAIDE, MSB #103543

Daniel M Waide, MS Bar #103543
1300 Hardy St.
PO Box 17738

Hattiesburg, MS 39404
601-582-4553 (Office)
601-582-4556 (Fax)
dwaide@jhrlaw.net

## CERTIFICATE OF SERVICE

I, Daniel M. Waide, do hereby certify that I have this day conventionally filed a true and correct copy of the above with Clerk of court and have this day mailed a true and correct copy of the same to:

    J. Cal Mayo, Jr., Esq.
    Drew Mauldin, Esq.
    Mayo Mallette PLLC
    Post Office Box 1456
    Oxford, Mississippi 38655

This the 31st day of August, 2018.

                                  DANIEL M. WAIDE, MSB #103543

Daniel M. Waide, (MSB#103543)
Johnson, Ratliff & Waide, PLLC
1300 HARDY ST.
PO BOX 17738
HATTIESBURG, MS 39404
601-582-4553 (OFFICE)
601-582-4556 (FAX)
dwaide@jhrlaw.net